# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action Number |
| ) | 16-00097-01-CR-W-DGK |
| Christopher L. Corn, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the DEFENDANT'S MOTION TO DISMISS (Doc. #74) filed on February 16, 2018 by defendant Christopher L. Corn ("Corn"). On April 18, 2018, the undersigned held an evidentiary hearing on Corn's motion to dismiss. Corn was present and represented by his counsel, Mark Thomason. The government was represented by Assistant United States Attorney Jeff McCarther. At the evidentiary hearing, testimony was given by Officer Robert Martin and Detective Frank Rorabaugh, both with the Kansas City Missouri Police Department. Previously, the Court held an evidentiary hearing on Corn's earlier filed suppression motion. Inasmuch as the underlying facts found in connection with that motion provide a helpful foundation to understanding the context of the present motion to dismiss, this order contains the 32 factual findings made by the Court after the first evidentiary hearing (including citations to the earlier February 9, 2017 hearing as "Tr.(I)") as well as the additional findings made for purposes of the pending motion to dismiss (including citations to the April 18, 2018 hearing as "Tr.(II)").

On the basis of all the evidence adduced at the evidentiary hearings and the legal arguments advanced, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT

1. On March 11, 2016, Justin Palmer was a police officer with the Kansas City Missouri Police Department patrolling in an undercover vehicle in the area of 84th Street and Paseo in Kansas City, Missouri. Tr.(I) at 4-5, 21.

2. On March 11, 2016, Robert Martin was also a police officer with the Kansas City Missouri Police Department who was likewise patrolling (in a marked police vehicle) in the area of 84th Street and Paseo in Kansas City, Missouri. Tr.(I) at 36-37.

3. At around noon on that date, Officer Palmer and his partner (Officer Bobbie King) observed a black Ford pickup truck being operated by an individual known to the officers to be a narcotics offender and dealer in stolen property. Tr.(I) at 6, 24.

4. Based on the individual's prior criminal history and the fact that he had an outstanding traffic warrant, the officers decided to conduct surveillance on the individual. Tr.(I) at 6-7, 22-23.

5. Eventually, the officers observed the truck pull into the parking lot for a McDonald's near 84th Street and Wornall. Tr.(I) at 7, 26-27.

6. The truck parked next to a white Ford Mustang. Tr.(I) at 8, 27.

7. Officer Palmer recognized the Mustang as a vehicle he had previously observed at another known narcotics location. Tr.(I) at 8.

8. The officers then observed the two occupants of the Ford truck exit the vehicle and go into the McDonalds. Tr.(I) at 8, 27.

9. Three to four minutes later, the officers observed five people simultaneously exit the McDonalds (including the occupants of the Ford truck) with two people getting in the Ford truck and three people getting into the Mustang. Tr.(I) at 8-9.

10. None of the people exiting the McDonalds appeared to have any food. Tr.(I) at 9.

11. Based on his experience, Officer Palmer believed a drug transaction had occurred. Tr.(I) at 9.

12. As the two vehicles were pulling out of the McDonalds parking lot, Officer Palmer radioed Officer Martin (who was known to Officer Palmer to be in the area) and told him that if he saw the white Mustang, it "would be good to conduct a traffic stop if possible." Tr.(I) at 9-10, 27-28, 30, 38.

13. Officer Palmer continued surveillance of the Ford truck. Tr.(I) at 10, 28-29.

14. Officer Martin meanwhile began following the Mustang. Tr.(I) at 39-40.

15. After following the Mustang briefly, Officer Martin observed the Mustang make a right turn into a driveway without signaling. Tr.(I) at 41, 61-62.

16. After the Mustang pulled into the driveway, Officer Martin parked his patrol car and approached the Mustang. Tr.(I) at 41-42.

17. As Officer Martin approached the vehicle, the driver (later identified as Corn) was attempting to exit the Mustang. Tr.(I) at 42-43.

18. Officer Martin asked Corn to remain in the vehicle and he asked Corn for identification. Tr.(I) at 42-44.

19. Corn told Officer Martin that he did not have a driver's license and gave Officer Martin a false name and initially indicated that his date of birth was 1923 (which would have meant that he was over 90 years old). Tr.(I) at 44.

20. Officer Martin then returned to his patrol car to request a second police vehicle to come to the scene. Tr.(I) at 45.

21. While Officer Martin was talking on the radio, Corn opened the driver's side Mustang door, exited the vehicle, and began fleeing the scene on foot. Tr.(I) at 45, 65.

22. Officer Martin pursued Corn. Tr.(I) at 45.

23. Officer Palmer overheard on the police radio that Officer Martin was engaged in a foot chase and proceeded to break off his surveillance of the Ford truck and headed to the location of the chase. Tr.(I) at 10-11, 30-31, 46, 65.

24. Upon his arrival in the area, Officer Palmer observed Corn running between houses and he also began a foot pursuit of Corn. Tr.(I) at 11, 33.

25. While in pursuit, Officer Palmer observed Corn "digging in his waistband in an attempt to pull something from his pants." Tr.(I) at 11, 32-33.

26. While still in pursuit, Officer Palmer observed Corn pull out of his waistband "a green Crown Royal bag with brown strings attached to it." Tr.(I) at 12, 33-34, 46.

27. Corn threw the bag away toward some nearby trolley tracks. Tr.(I) at 12, 33-34.

28. Within seconds after throwing the bag away, Corn was taken into custody. Tr.(I) at 12-13.

29. Officer Palmer recognized Corn from a prior encounter involving a stolen automobile. Tr.(I) at 13-14, 34.

3

30. After Corn was arrested, Officer Palmer located the bag thrown by Corn during the foot chase. Tr.(I) at 14, 34.

31. The bag was found about 7 to 15 feet from the point of arrest. Tr.(I) at 14, 46.

32. The bag contained a Rosco .22 caliber revolver. Tr.(I) at 14-15, 46. 5

33. Martin took photographs at the scene of the Crown Royal bag and the revolver including photos of the general area as well as closer shots of the bag and gun. Tr.(II) at 5-6.

34. Because Martin's police-issued camera was in his car (which he left to pursue Corn after he fled), Martin borrowed a camera from another officer at the scene. Tr.(II) at 6, 12.

35. The photos generally depicted the position of the bag and the gun inside the bag. Tr.(II) at 6.

36. After taking the photos, Martin returned the camera to the officer. Tr.(II) at 6-7.

37. Neither Martin nor the officer who loaned him the camera uploaded the photos taken that day. Tr.(II) at 6-7.

38. Martin has no idea where the photos are or if they are recoverable. Tr.(II) at 7-9.

39. Martin does not believe the photos would have been helpful to Corn. Tr.(II) at 7.

40. Frank Rorabaugh is a Detective with the Kansas City Missouri Police Department, currently assigned to the Illegal Firearms Squad. Tr.(II) at 17-18.

41. After the firearm was seized at the scene of Corn's arrest, it was not immediately processed for DNA. Tr.(II) at 19.

42. Due to finite resources, the lab for the Kansas City Missouri Police Department has a policy to not check weapons for DNA in cases wherein an officer observed a defendant in possession of a firearm. Tr.(II) at 19, 23-26.

43. Det. Rorabaugh estimated that in only 10% of cases do law enforcement officers obtain "a usable DNA hit" on a firearm. Tr.(II) at 20.

44. Ultimately, after being ordered by the Court on Corn's motion, the gun recovered at the scene of Corn's arrest was submitted for DNA analysis. Tr.(II) at 21.

45. The DNA analysis revealed "a couple of different contributors" but no match for Corn. Tr.(II) at 21-22.

46. The Crown Royal bag was also submitted for DNA analysis but it was determined to be unsuitable for any DNA comparison. Tr.(II) at 21-22.

## PROPOSED CONCLUSIONS OF LAW

In his motion to dismiss, Corn argues that the indictment in this case must be dismissed inasmuch as his due process rights were violated by the government's destruction of evidence. Specifically, Corn argues that (1) the loss of photographs taken at the arrest scene by Officer Martin and (2) the inability to obtain a suitable DNA sample from the Crown Royal bag requires a dismissal in this case.

Two United States Supreme Court cases, *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988) frame the issue for the Court. As a general matter, the government violates a defendant's due process rights when it does not preserve material exculpatory evidence. *Trombetta*, 467 U.S. at 488-89, 104 S. Ct. at 2533-34. To satisfy the standard of constitutional materiality, a defendant must establish that the missing evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489, 104 S.Ct at 2534. To this end, the Supreme Court has suggested and most circuit courts have held that no showing of bad faith is necessary by a defendant if the missing evidence is "material exculpatory evidence" as defined in *Trombetta*. *See*, *e.g.*, *Youngblood*, 488 U.S. at 57, 109 S. Ct. at 337; *Illinois v. Fisher*, 540 U.S. 544, 547-48, 124 S. Ct. 1200, 1201-02 (2004); *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006); *United States v. Estrada*, 453 F.3d 1208, 1212-13 (9th Cir. 2006); *Bullock v. Carver*, 297 F.3d 1036, 1056 (10th Cir. 2002); *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001) (all holding that the destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith).

By contrast, if the missing evidence does not meet the standard of "material exculpatory evidence" as defined in *Trombetta*, but nonetheless is shown by a defendant to be "potentially useful," the failure of the government to preserve the evidence will constitute a denial of due process of law only when the defendant "can show bad faith on the part of the police." *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337; *Fisher*, 540 U.S. at 549, 124 S. Ct. at 1202 (applicability of the bad-faith requirement in *Youngblood* depends "on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence.").[1] Thus:

(1) the destruction of "apparently exculpatory" evidence constitutes a due process violation without the need for showing bad faith, and

(2) the destruction of only "potentially useful" evidence constitutes a due process showing upon a showing of bad faith by the government.

This dichotomy has been summarized by the Eighth Circuit:

> A due process violation arises from destruction of evidence when the evidence possesses an exculpatory value that was apparent before the evidence was destroyed, and is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. A higher standard of proof applies, however, when the evidence is only potentially useful to the defendant. Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*United States v. Tyerman*, 701 F.3d 552, 560 (8th Cir. 2012) (*citations and punctuation omitted*).

---

[1] [W]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Part of it stems from our unwillingness to read the fundamental fairness requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

*Youngblood*, 488 U.S. at 57-58, 109 S.Ct at 337.

In this case, the Court does not find the photographs and the potential DNA from the Crown Royal bag to be "material exculpatory evidence" as defined in *Trombetta*. While it is possible that the evidence could be exculpatory, it is just as possible that the evidence could have been inculpatory or – with regard to both pieces of evidence – utterly neutral in their weight in determining Corn's guilt or innocence. Under these facts, the Court thus finds that Corn has not shown that the materials are <u>necessarily exculpatory</u>. Nor has Corn shown that any exculpatory value the missing evidence may have had would have been apparent to the government at the time the evidence was "lost." Instead, the Court finds that Corn, at best, has demonstrated that the missing evidence was potentially useful to his case. *Compare Tyerman*, 701 F.3d at 560 (in prosecution for felon-in-possession, where government allegedly recklessly destroyed gun, defendant showed "[a]t most, the firearm was potentially useful to" his case).

Inasmuch as the missing evidence may have been potentially useful, Corn must demonstrate bad faith on the part of the government so as to establish a due process violation. In that regard, however, the Court credits the testimony of Officer Martin regarding the circumstances surrounding the taking of pictures at the scene of Corn's arrest, the negligent conduct in failing to upload or otherwise preserve the photos, and Officer Martin's good faith (but ultimately unsuccessful) search for the photographs. In addition, the Court credits the explanation for not attempting to obtain a DNA sample from the Crown Royal bag expeditiously after its seizure. The Court does not find these actions were taken in bad faith.

The Court's conclusion is bolstered by the analysis formulated by the Tenth Circuit in scrutinizing government conduct for bad faith in the destruction or loss of evidence:

> (1) Did the government have explicit notice that a defendant believed the missing evidence was exculpatory when the evidence was lost or destroyed?

7

(2) Is a defendant's claim that this evidence is potentially exculpatory conclusory or is it, instead, supported with objective, independent evidence?

(3) Did the government still have the ability to control the disposition of the evidence at the time defendant indicated that the evidence might be exculpatory?

(4) Was the evidence disposed of central to the case?

(5) Does the government offer any innocent explanation for its failure to preserve the evidence?

*United States v. Bohl*, 25 F.3d 904, 912 (10th Cir. 1994)

With respect to the first factor, the Court has been provided with no information that Corn gave notice to the government that he believed the arrest scene photos and DNA sample from the Crown Royal bag were exculpatory until this action had been pending for some time. There certainly is nothing in the record before the Court to indicate that the government "destroyed" the evidence in the face of a request from Corn to preserve it. With respect to the second factor, the Court finds Corn's arguments to be conclusory – he is unable to point the Court to any independent evidence that would suggest that the arrest scene photos and DNA sample from the Crown Royal bag might lead to exculpatory evidence. With respect to the third factor, it appears that the evidence was lost before Corn raised the possibility that the evidence was exculpatory. With respect to the fourth factor, it does not appear that the arrest scene photos and DNA sample from the Crown Royal bag which were lost were central to the case. With respect to the fifth factor, as previously explained, the Court credits the government's innocent explanation for the failure to preserve the arrest scene photos and DNA sample from the Crown Royal bag. Considering these five factors, the Court concludes that the government did not act in bad faith. Corn's due process rights were not violated by the government's failure to preserve the arrest scene photos and a usable DNA sample from the Crown Royal bag.

Accordingly, the Court finds the defendant has not shown he is entitled to dismissal on the ground of destruction of exculpatory evidence. The remedy, if any, would be an adverse inference instruction <u>if</u> there should be a proper showing at trial. Whether any such an instruction is necessary or appropriate will not be and cannot be determined at this time.

In light of the foregoing discussion, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the DEFENDANT'S MOTION TO DISMISS (Doc. #74) filed on February 16, 2018 by defendant Christopher L. Corn.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                             */s/ John T. Maughmer*
                                               **John T. Maughmer**
                                         **United States Magistrate Judge**